Filed 2/17/26

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEREK J. GUTIERREZ,<br><br>    Defendant and Appellant. | D086351<br><br><br><br>(Super. Ct. No. SWF2301890) |

APPEAL from a judgment of the Superior Court of Riverside County, Louis R. Hanoian, Judge.  Reversed and remanded.

Brad J. Poore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In October 2015, Governor Edmund Gerald Brown Jr. declared a state of emergency in California due to "Tree Mortality."  Record drought conditions over four years had caused epidemic infestations of native bark

beetles. According to the United States Forest Service, the infestations caused the death of more than 22 million trees, with the death of 10 million more yet to come. The proclamation establishing the state of emergency warned "this die-off is of such scale that it worsens wildfire risk across large regions of the State, presents life safety risks from falling trees to Californians living in impacted rural, forested communities, and worsens the threat of erosion across watersheds." The proclamation directed four state agencies to immediately identify "areas of the [s]tate" that represent "high hazard zones" for wildfire and falling trees "using [the] best available science and geospatial data." Eight years later, in 2023, the state of emergency was still ongoing.

In December 2023, Derek J. Gutierrez was arrested for setting a fire in Riverside County near what the parties and witnesses refer to as the Ortega Mountains. A jury convicted him of felony arson of forest land and found true a sentencing enhancement allegation that he set the fire "during and within an area" proclaimed by the Governor to be in a state of emergency. (Pen. Code, § 454, subd. (a)(2).) The enhancement elevates the sentencing triad for this type of arson by five, seven, or nine years. The additional punishment is warranted for obvious policy reasons, given the continual state of drought, wildfire, and other risk of disaster in our state. In the words of the trial court, "Arson of forest land is incredibly dangerous. In this part of the world, to set a fire in the wildlands is beyond irresponsible."

The parties here dispute whether the tree mortality state of emergency declared by Governor Brown extended statewide generally—that is, throughout the entire territorial jurisdiction of California—or whether it existed only in specific areas and zones of California determined to have been impacted by bark beetle infestation. As we explain, this question is one that

2

should have been resolved by the trial court below, but it was not. It was instead left for the jury to resolve. This was error because the interpretation of the Governor's proclamation is a purely legal question; it is not a question for the jury.

Based on our independent review of Governor Brown's proclamation, we agree with Gutierrez that the tree mortality state of emergency did not extend statewide. As a result, we are compelled to reverse the jury's true finding on the state of emergency enhancement allegation for insubstantial evidence. As we interpret the proclamation, it existed only in certain very specific areas of the state, and the People failed to meet their burden of identifying those areas for the jury and proving Gutierrez set a fire in one of them.

We reject Gutierrez's other claims of error and so we (1) affirm his underlying conviction for arson of forest land, (2) remand for a full resentencing, and (3) if Gutierrez requests, direct the trial court to conduct a hearing to determine whether he has the ability to pay fines and ancillary costs under the guidance of our high court's recent decision, *People v. Kopp* (2025) 19 Cal.5th 1 (*Kopp*).

## PROCEDURAL AND FACTUAL BACKGROUND

### I.

### *Prosecution Case*

In 2023, Jorge L. lived in Riverside County near the Ortega Mountains. The property had four or five buildings on about eight acres of land. It was "rural in the back and . . . next to a big hill."

On December 9, 2023, around 6:30 a.m., Jorge heard "yelling and screaming" outside. He drove up the hill to investigate. He stopped the truck near some bushes about halfway between his house and the mountains.

3

Gutierrez came out of the bushes wearing a backpack. He was about 100 or 200 feet from Jorge. Jorge recognized him because, about a year earlier, he had seen the owner of the property tell Gutierrez to leave the property and never come back.

Jorge asked Gutierrez what he was doing, and Gutierrez asked him for a beer. Jorge took a photograph of Gutierrez and told him he had no beer. Gutierrez went back into the bushes, and Jorge could no longer see him. A few minutes later, Jorge saw smoke coming from the bushes. He called the property owner, then 911. While Jorge was on the phone reporting the smoke to the 911 dispatcher, Gutierrez began walking down the hill while "yelling, and saying something."

Firefighters from the Riverside County Fire Department arrived within 15 to 20 minutes. A fire captain noticed smoke as he approached. He saw a person standing near the location of the smoke. The person started walking down the hill through the forest toward Lakeland Village. The captain later identified the person as Gutierrez.

Jorge walked with the fire captain to the area where he had seen the smoke. When they got there, it looked to Jorge like there had been a fire, but someone put dirt on it to try and put it out. He could see "little ashes" and "embers," and the material was still smoking. The firefighters smothered the smoking material and then used water to cool it down.

Based on his experience and training, the fire captain believed there had been a fire and it had been set intentionally and maliciously, not by accident. The material used as tinder to start the fire was different than the surrounding vegetation, and it appeared to have been deliberately arranged "to facilitate combustion" in a way that "would spread fire to any adjacent wood in the area." The fire was set near brush and "ladder fuels," meaning

4

surface fuels on the ground that would "ladder" the fire to "aerial fuels" on the top of the trees. The fire did not appear to be intended for cooking because "[t]here were no utensils, no pots, no pans, and no specific border around the fire to maintain control of that fire." As a result, there was nothing to ensure the fire would "be fixed in one location for cooking." For example, there was no circle of rocks set up to keep the fire from escaping.

That afternoon, around 2:00 or 3:00 p.m., a fire investigator with the Department of Forestry and Fire Protection (CAL FIRE) was dispatched to investigate the fire. On his way, he saw a man walking on Grand Avenue in Lakeland Village about a mile and a half from the property. The man was smoking a cigarette. The investigator stopped, spoke with the man, and took a picture of him. He asked the man if he had any lighters, and the man showed him he had one. The man was carrying a backpack and a grocery bag.

The fire investigator continued on his way to interview Jorge and then walked with him to where he had seen the smoke and the remains of the fire. Jorge showed him the picture of Gutierrez. The investigator recognized Gutierrez as the person he had just seen and spoken to on Grand Avenue, and noticed he was wearing the same clothes.

The fire investigator observed the fire had been set in a very secluded area on a slope near the Ortega Mountains. He searched for evidence of accidental ignition sources for the fire, such as fireworks or evidence that someone had been smoking. He found none. He also found no evidence that people had been living or even "hanging out" in the area. For example, he found no evidence of "cooking materials, pans, food, [or] discarded trash." The investigator also observed that the pitch of the slope where the fire was located was steep enough to make it unreasonable to believe that anyone

would camp or live there. He concluded that someone started the fire intentionally and maliciously and that Gutierrez was that person.

The fire investigator headed back to where he had seen Gutierrez and found him walking on Grand Avenue about a mile from the location of the fire. He arrested him and patted him down for weapons. According to the investigator, Gutierrez physically resisted when he tried to handcuff him. The investigator called for backup and eventually managed to place Gutierrez in the back of his CAL FIRE truck.

The fire investigator found two lighters in Gutierrez's pocket and three lighters in his backpack and grocery bag. One of the lighters was a "small butane lighter" that was out of fuel. In the investigator's opinion, it is easier to start a fire with a butane lighter, as opposed to a standard lighter, because butane lighters produce a more highly concentrated, intense flame.

The fire investigator explained that the California Governor's Office of Emergency Services (CGOES) maintains a webpage that tracks open states of emergency, and there were numerous states of emergency in effect in California on the day Gutierrez set the fire. The People introduced a printout of the webpage's "list of open [s]tates of [e]mergency proclaimed by the Governor as of March 22, 2024" (CGOES webpage). It had four columns with information categorized under "Event Type," "Location," "Proclamation Date," and "Executive Orders." (Boldface omitted.) According to the CGOES webpage, Governor Brown had declared a state of emergency identified as "Tree Mortality" on October 30, 2015. For this state of emergency, under "Location," the CGOES webpage stated "Statewide." (Boldface omitted.)

The People also introduced a copy of Governor Brown's October 30, 2015 "Proclamation of a State of Emergency" regarding tree mortality. (Boldface and some capitalization omitted.) Unlike the CGOES webpage, the

6

text of the proclamation does not describe the tree mortality state of emergency as "[s]tatewide." The proclamation states that a four-year drought has made trees "in many regions" of California susceptible to epidemic infestations of native bark beetles. It says bark beetle infestations "across broad areas" have worsened the risk of wildfire, falling trees, and erosion "in several regions of the state." And it directs four state agencies to immediately identify "areas of the [s]tate" that represent "high hazard zones" for wildfire and falling trees "using [the] best available science and geospatial data." We do not know whether such areas or zones were identified, or if identified, where they were, because the People did not introduce evidence of any action taken by the four state agencies.

## II.

### *Charges, Trial, and Sentencing*

On December 13, 2023, the Riverside County District Attorney charged Gutierrez with felony arson of forest land (Pen. Code, § 451, subd. (c); count 1) and misdemeanor resisting, delaying, or obstructing a peace officer (Pen. Code, § 148, subd. (a); count 2). As to the arson count, the District Attorney alleged Gutierrez had been previously convicted of arson (Pen. Code, §§ 451, subd. (d), 451.1, subd. (a)(1)) and he committed the charged arson "during and within an area" of a state of emergency declared by the Governor pursuant to Government Code section 8625 (Pen. Code, § 454, subd. (a)(2)). The operative information alleged two prior serious felony convictions (Pen. Code, § 667, subd. (a)), two prior strike convictions (Pen. Code, §§ 667, subds. (c) & (e), 1170.12, subd. (c)), and an aggravating sentencing factor within the meaning of California Rules of Court, rule 4.421(b)(3) (defendant has served a prior prison or county jail term under Pen. Code, § 1170, subd, (h)).

7

In April 2024, a jury found Gutierrez guilty as charged and found true the state of emergency enhancement allegation. After waiving his right to a jury trial on the other prior conviction allegations, Gutierrez admitted he suffered the two prior serious felony convictions and the two prior strike convictions. The trial court dismissed the aggravating factor on the People's motion.

In July 2024, the trial court granted Gutierrez's motion to dismiss one of his prior strike convictions. It then sentenced Gutierrez to 14 years in state prison on the arson count plus five years for the prior serious felony enhancement. The court sentenced him concurrently to 364 days in county jail on the misdemeanor. The total term imposed was 19 years.[1]

## DISCUSSION

### I.

### *Insufficient Evidence to Support the State of Emergency Enhancement for Arson*

Gutierrez contends insufficient evidence supports the jury's true finding that he violated Penal Code section 454 by committing arson "during and within an area" proclaimed by the Governor to be in a state of emergency pursuant to Government Code section 8625. (Pen. Code, § 454, subd. (a)(2).) He contends Governor Brown did not proclaim a tree mortality state of emergency "to exist in every corner of every county in the state of California." In his view, the state of emergency was limited to areas determined by four state agencies to be " 'high hazard zones for wildfire and falling trees.' "

---

[1] The trial court and the People failed to address the Penal Code section 451.1 prior arson conviction enhancement. Gutierrez's sentence accordingly does not include this enhancement. The court also failed to address the other prior serious felony conviction enhancement (Pen. Code, § 667, subd. (a)) at sentencing.

Because the prosecution failed to identify those areas at trial, he contends the evidence was insufficient for a reasonable jury to conclude he committed arson in an area where a state of emergency existed due to tree mortality.

We agree with the parties that our review of the sufficiency of the evidence is conducted using the substantial evidence standard of review. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  The nature of our review is complicated, however, by the trial court's erroneous submission of a legal question to the jury.  As noted, the court allowed the jury to interpret the language in Governor Brown's proclamation and to decide the precise territorial scope of the tree mortality state of emergency.  But this critical question should have been resolved by the court, not left to the jury's untrained construction.  The construction of a state of emergency proclamation is a purely legal question.  Like the interpretation of an executive order, the interpretation of a proclamation "presents an issue akin to an issue of statutory interpretation." (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 877 (*Morgan Hill*).)  The precise territorial scope of the tree mortality state of emergency—a question we must resolve before we assess the sufficiency of the evidence—is therefore subject to our independent review on appeal. (*Ibid.*)

Based on our independent review, we agree with Gutierrez that the tree mortality state of emergency declared by Governor Brown in 2015, and still open as of December 9, 2023, did not extend throughout our entire state.  Consequently, based on our review for substantial evidence, we are compelled to reverse the jury's true finding for lack of evidence.  Although the People adduced ample evidence Gutierrez set a fire *during* a state of emergency proclaimed by the Governor, they failed to adduce evidence the fire was set

9

*within an area* so designated by the Governor. As we explain, our conclusion is based on the plain language of the Governor's proclamation.[2]

Our analysis starts with the California Emergency Services Act (CESA), which was enacted in 1970. (Stats.1970, ch. 1454, § 1, p. 2845.) CESA "recognizes and responds to a fundamental role of government to provide broad state services in the event of emergencies resulting from conditions of disaster or of extreme peril to life, property, and the resources of the state. Its purpose is to protect and preserve health, safety, life, and property." (*Martin v. Municipal Court* (1983) 148 Cal.App.3d 693, 696.)

CESA equips our governors with the power to declare a state of emergency *within the state in an area affected or likely to be affected by the emergency*. Section 8558 of the Government Code[3] defines a state of emergency as follows: " 'State of emergency' means the duly proclaimed existence of conditions of disaster or of extreme peril to the safety of persons and property *within the state* caused by conditions such as air pollution, fire, flood, storm, epidemic, riot, drought, cyberterrorism, sudden and severe energy shortage, electromagnetic pulse attack, plant or animal infestation or disease, the Governor's warning of an earthquake or volcanic prediction, or an earthquake, or other conditions, . . . which, by reason of their magnitude, are or are likely to be beyond the control of the services, personnel,

---

[2] Gutierrez filed a motion requesting that we take judicial notice of four open proclamations listed on the CGOES webpage, so we can "compare and contrast the language used . . . in different 'statewide' [state of emergency] proclamations." We decline the request. (Evid. Code, §§ 452, 459.) Such comparisons might assist in another case, but here we find it unnecessary to review anything outside the four corners of the proclamation itself.

[3] Further undesignated statutory references are to the Government Code.

equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat." (§ 8558, subd. (b), italics added.) If such circumstances exist, section 8625 empowers the Governor "to proclaim a state of emergency *in an area affected or likely to be affected thereby*." (Italics added.) Thus, if there is an emergent peril or disastrous condition within the territorial boundaries of California, sections 8625 and 8558 empower the Governor to proclaim a state of emergency in a specified area of the state.[4]

Our governors have used this power to declare states of emergency in specific counties within the state. (*Macias v. State of California* (1995) 10 Cal.4th 844, 847–848 [state of emergency found to exist within Los Angeles County due to mediterranean fruit fly infestation]; *Planning & Conservation League v. Department of Fish & Game* (1987) 55 Cal.App.4th 479, 482 [state of emergency found to exist within several California counties due to major flooding].) The power has been used to declare a state of emergency in specific discrete areas located across the state. (*California Correctional Peace Officers Assn v. Schwarzenegger* (2008) 163 Cal.App.4th 802, 808—809 [state

_____

[4]    CESA establishes and defines three emergency situations:  a " '[s]tate of emergency,' " a " '[s]tate of war emergency,' " and a " '[l]ocal emergency.' " (§ 8558.)  As discussed, the Governor is empowered to declare a " '[s]tate of emergency' " when certain perils and disastrous conditions exist "within the state." (§ 8558, subd. (b).)  The Governor is also empowered to declare a " '[s]tate of war emergency' " if California or the United States "is attacked by an enemy . . . , or upon receipt by the state of a warning from the federal government indicating that an enemy attack is probable or imminent." (§ 8558, subd. (a).)  Finally, the governing body of a city, county, or city and county together, or a duly designated official, are empowered to declare a local emergency when certain perils and disastrous conditions exist "within the territorial limits of a county, city and county, or city." (§§ 8558, subd. (c)(1), 8630, subd. (a).)

11

of emergency found to exist in California prison facilities due to overcrowding].) The power has also been used to declare a statewide emergency throughout the entire territorial jurisdiction of the state. (*Lacayo v. Superior Court* (2020) 56 Cal.App.5th 396, 399 [state of emergency found to exist statewide due to COVID-19 pandemic].)

Numerous statutes in California enhance the punishment of crimes committed in areas proclaimed to be in a state of emergency. (See, e.g., Pen. Code, §§ 667.16, 670; Bus. & Prof. Code, § 6788.) The state of emergency enhancement statute at issue here, Penal Code section 454, subdivision (a), elevates the sentencing triad for the type of arson charged here by five, seven, or nine years when the offense is committed "during and within an area" proclaimed by the Governor to be in a state of emergency. In relevant part, the statute provides: "Every person who violates [Penal Code section] 451 . . . *during and within an area* of any of the following, when proclaimed by the Governor, shall be punished by imprisonment in the state prison, as specified in subdivision (b): [¶] (1) [a] state of insurrection pursuant to [s]ection 143 of the Military and Veterans Code[,] [or] [¶] (2) [a] state of emergency pursuant to [s]ection 8625 of the Government Code." (Pen. Code, § 454, subd. (a).) Based on the plain language of Penal Code section 454, to prove true a state of emergency enhancement for arson, the People must demonstrate both (1) the crime of arson was committed during a state of emergency declared by the Governor pursuant to Government Code section 8625, and (2) the arson was committed within an area proclaimed by the Governor to be subject to the state of emergency.[5]

---

[5] We observe the jury here was given ambiguous instructions. They were not clearly told they could only find the state of emergency enhancement true if the arson was *both* committed *during* a state of emergency and *within an area* proclaimed by the Governor to be in a state of emergency. (Pen. Code,

12

We turn next to the plain language of the state of emergency proclamation at issue here. Based on our independent review of that language, Governor Brown did not proclaim a tree mortality state of emergency throughout the entire territorial expanse of California.

To begin, the findings of extreme peril that are set forth in the proclamation do not extend throughout California. The proclamation declares, in relevant part, that "a lack of precipitation over the last four years has made trees *in many regions* of California susceptible to epidemic infestations of native bark beetles, which are constrained under normal circumstances by the defense mechanisms of healthy trees; and [¶] . . . these drought conditions and resulting bark beetle infestations *across broad areas* have caused vast tree mortality *in several regions* of the state, with the United States Forest Service estimating that over 22 million trees are dead and that tens of millions more are likely to die by the end of this year; and [¶] . . . [¶] this die-off is of such a scale that it worsens wildfire risk *across large regions* of the State, presents life safety risks from falling trees to

§ 454.) Specifically, the instruction told jurors the state of emergency enhancement could be found true if it was committed "at a time where" a state of emergency had been declared: "If you find the defendant guilty of the crime charged in Count 1, or the lesser offense to Count 1, you must then decide whether the People have proved the additional allegation that the defendant committed the offense during and within a declared state of emergency. [¶] *To prove this allegation, the People must prove the crime was committed at a time where the Governor of the State of California had declared a state of emergency pursuant to Government Code [s]ection 8625.*" (Italics added.) In addition, during closing argument, the prosecutor incorrectly told the jury they did not have to make a finding on the second element. The prosecutor stated, "In order to find [the allegation] true, you just have to find that there was an active state of emergency declared by the [G]overnor pursuant to [section] 8625." Gutierrez has not sought reversal based on instructional error or prosecutor error at closing argument, so we do not address whether either of these errors was prejudicial.

Californians living in impacted rural forested communities, and worsens the threat of erosion across watersheds; and [¶] . . . [¶] the circumstances of the tree die-off, by reason of its magnitude, is or is likely to be beyond the control of the services, personnel, equipment and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat." (Italics added.) This language clearly ties the findings of extreme peril to specific areas and regions within the state. It cannot reasonably be interpreted to mean that the emergent danger from tree mortality extends statewide, to every corner of the state, from all our urban, suburban, and rural communities to all our beaches, farmlands, and deserts.

Nor does the language in the proclamation itself say anything about a statewide state of emergency. Governor Brown proclaims "a state of emergency to exist *within the State of California,*" but he does not go on to declare the state of emergency exists "throughout" the state, nor that it exists "statewide." (Italics added, boldface and capitalization omitted.) Nor does he use other language to indicate the state of emergency exists in every part of the entire state.[6]

To the contrary, Governor Brown orders four state agencies—the Department of Forestry and Fire Protection, the California Natural Resources Agency, the California Department of Transportation, and the California Energy Commission—to identify specific areas within the state affected by the emergency. The proclamation directs the agencies to "immediately *identify areas* of the State that represent *high hazard zones* for

---

[6] The proclamation does recount that *one year earlier* Governor Brown proclaimed a state of emergency to exist "throughout" California due to severe drought conditions. The parties do not dispute that the 2014 drought state of emergency existed statewide but terminated at an unknown time before 2023.

wildfire and falling trees using best available science and geospatial data." We agree with Gutierrez that this language in the proclamation does not declare a statewide state of emergency, but rather expressly limits the state of emergency to areas and zones of the state that were yet to be identified.

Because the proclamation did not extend statewide, the People failed to prove Gutierrez committed arson during and within an area in a state of emergency. (Pen. Code, § 454.) Governor Brown declared a state of emergency existed only with respect to certain particular areas of the state at heightened risk for wildfire and falling trees as a result of bark beetle infestation, areas he called "high hazard zones." The People failed to present evidence to prove the fire set by Gutierrez was located within one of these areas. The People elicited no testimony by an official from one of the four agencies tasked with identifying high hazard zones that the fire was set within an affected area. They proffered no map or other documentary evidence of areas infested with bark beetles as an exhibit. Nothing at all. In the face of no evidence to satisfy a required element of proof, we are obligated by the federal constitution to reverse the jury's true finding with respect to the state of emergency enhancement. (U.S. Const., 14th Amend.) "[A]n essential of the due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." (*Jackson v. Virginia* (1979) 443 U.S. 307, 316.)

The People contend a reasonable jury could have interpreted Governor Brown's proclamation otherwise and it could have concluded the state of emergency extended throughout the entire state. This argument misses the point. As we have explained, the construction of a state of emergency

15

proclamation is a legal question that jurors, as laypersons, are not equipped to undertake. And based on our independent review, we have concluded the plain language of the Governor's proclamation expressly limits the state of emergency to specific zones and areas within the state that are to be identified by four government agencies. Regardless, even if the question were presented to a jury, which would be improper, we do not agree it would be reasonable to interpret the language used by the Governor to be declaring a statewide state of emergency. The language in the proclamation simply cannot be construed to say the emergency exists throughout the state.

Nor do we agree that the CGOES webpage provides a potential basis for concluding the tree mortality state of emergency is statewide. As noted, the webpage does say the tree mortality state of emergency is "[s]tatewide." But this characterization of what Governor Brown's proclamation says conflicts with the plain language of the actual proclamation itself. The principles of statutory interpretation apply to the interpretation of a state of emergency proclamation (cf. *Morgan Hill*, *supra*, 118 Cal.App.4th at p. 877), and one of the most fundamental of these principles is that we do not consider extrinsic aids when interpreting the meaning of statutory language unless there is an ambiguity (*People v. King* (2006) 38 Cal.4th 617, 622). The proclamation here unambiguously provides that the state of emergency is limited to zones and areas to be identified by four government agencies.

The People argue that any discrepancy between the language in Governor Brown's proclamation and the " '[s]tatewide' designation on the [CGOES] website" is a "conflict in the evidence," and the jury's resolution of that conflict "may not be disturbed on appeal under the substantial evidence standard of review." Again, the People's contention misses the mark. It was the trial court's role, not the jury's, to interpret the meaning and effect of the

16

language in the Governor's proclamation.  And it is our role, on appeal, to independently interpret that language.

The People, in any event, are incorrect that this type of conflict must be resolved in favor of the jury's verdict under these circumstances.  Any possible inference that the CGOES's webpage accurately describes Governor Brown's proclamation is squarely rebutted by the actual proclamation itself, which the prosecution put into evidence.  " '[A] trier of fact may not indulge in inferences rebutted by clear, positive and uncontradicted evidence.' " (*Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1487.)

Finally, the People contend jurors could have found a state of emergency existed throughout Riverside County on the date of the fire based on a *different* open proclamation listed on the CGOES webpage:  the Governor's October 19, 2021 proclamation labeled, "Drought — additional eight counties."  The webpage describes the location of this 2021 state of emergency as including "Riverside" County.  Pointing to this 2021 proclamation (for the first time), the People argue there was essentially indisputable evidence that Gutierrez set the fire in Riverside County.  We have difficulty with this argument, for two reasons.

First, although the CGOES webpage describes the location of this 2021 state of emergency as including "Riverside" County, absent from the evidence is the proclamation itself.  We know from our analysis of Governor Brown's 2015 proclamation of a tree mortality state of emergency that what is listed under "Location" for a state of emergency on the CGOES webpage cannot be taken at face value.  Here, the People did not submit the actual text of the 2021 proclamation to the trial court so the court could interpret its precise territorial scope and instruct the jury accordingly.

17

Second, we find the prosecution's alternative theory to be unsupported by substantial evidence. The CGOES webpage is devoid of any evidence that the 2021 state of emergency was proclaimed pursuant to Government Code section 8625, a necessary element of the Penal Code section 454 enhancement allegation. The People did not argue their alternate theory to the jury; they relied solely on the tree mortality state of emergency. As a result, they did not move the 2021 proclamation of a drought state of emergency into evidence, and so, evidence the emergency was declared pursuant to Government Code section 8625 was not before the jury.[7] Although ordinarily, for purposes of substantial evidence review, a judgment may be upheld based on a factual theory that was not argued by the prosecutor (*People v. Brown* (2017) 11 Cal.App.5th 332, 341), here, the evidence supporting the People's new theory was insufficient for a reasonable juror to find the state of emergency enhancement true beyond a reasonable doubt.

Based on the plain language of Governor Brown's 2015 tree mortality state of emergency proclamation, we agree with Gutierrez that the prosecution here neglected to adduce evidence sufficient to support a true finding with respect to the state of emergency enhancement for arson. We

---

[7]     For the first time on appeal, the People ask us to take judicial notice of the 2021 proclamation of a drought state of emergency. They ask us to do so "if [we] grant[ ] judicial notice of the state of emergency proclamations cited in [Gutierrez's] brief." As noted, we have denied Gutierrez's requests for judicial notice. We therefore deny the People's request. The People, moreover, have not explained why they did not request judicial notice in the trial court. " 'An appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459 of a matter which should have been presented to the trial court for its consideration in the first instance.' " (*County of Los Angeles Dept. of Public Health v. Superior Court* (2021) 61 Cal.App.5th 478, 486, fn. 3.)

18

reverse the jury's true finding and remand for a full resentencing.[8] (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

II.

*No Prejudicial Ineffective Assistance of Counsel*

Gutierrez contends his counsel was ineffective because she failed to object to expert opinion testimony by the fire captain and fire investigator about the cause of the fire. We are persuaded that one of the statements by the investigator was inadmissible. He improperly testified, "It was my professional opinion that [Gutierrez] maliciously and intentionally started that fire on that property." Although we agree this testimony impermissibly invaded the province of the jury, we find no prejudice. We then do not reach the question whether counsel was ineffective for failing to object.

As a general rule, an expert may give testimony in the form of an opinion only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd (a).) " ' " 'Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' " ' " (*Burton v. Sanner* (2012) 207

---

[8] Because we reverse for insubstantial evidence, and there can be no retrial, we do not reach Gutierrez's contention that Penal Code section 454 is void for vagueness under our state and federal constitutions. Our remand for a full resentencing also moots Gutierrez's contention there is a clerical error in the abstract of judgment. Finally, for guidance on remand, we observe that the trial court, for the arson count, imposed a term of *seven* years, doubled pursuant to the prior strike conviction, for a total of 14 years. However, "[a]rson of a structure or forest land is a felony punishable by imprisonment in the state prison for *two, four, or six* years." (Pen. Code, § 451, subd. (c), italics added.) In addition, as noted, the court failed to address one of Gutierrez's prior serious felony conviction enhancements (Pen. Code, § 667, subd. (a)).

19

Cal.App.4th 12, 19.)  In particular, "when an expert's opinion amounts to nothing more than an expression of his or her belief on how a case should be decided, it does not *aid* the jurors, it *supplants* them."  (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1183 (*Summers*).)  The admission of such testimony can be prejudicial because, "[w]hen an expert testifies to conclusions that a lay jury can draw, it suggests ' " 'that the judge and jury may shift responsibility for decision to the witness[ ].' " ' "  (*People v. Rouston* (2024) 99 Cal.App.5th 997, 1011 (*Rouston*); see *id.* at pp. 1011—1012.)

Gutierrez contends his counsel should have objected to three opinion statements by the fire captain and fire investigator.  In our view, the first two statements were unobjectionable.  The statements addressed technical aspects of investigating and deducing the cause of a fire.  Specifically, based on years of training and experience, the captain and the investigator explained the inferences that could be drawn from evidence at the scene of the fire, and how those inferences could be used to determine whether a person who set a fire did so accidentally or intentionally and maliciously.  This is a topic beyond the ken of the average person, one which almost all jurors would need expert assistance to learn about and apply to the facts of the case.  Critically, in the first two statements, the captain and investigator opined that *whoever set the fire* did so intentionally and maliciously.  They did not opine that *Gutierrez* set the fire intentionally and maliciously.

After the fire captain discussed the evidence that he had observed at the scene of the fire, the prosecutor asked him, "You mentioned that in your training your experience, you believe this fire was intentionally [and] maliciously set.  Can you walk us through how you get there?"  The captain replied, "Yes.  Like I previously mentioned, I believe the fire to be set intentionally and maliciously based on materials gathered, broken up to have

created a fuel for intentional emission." He further explained, the "[l]ocation of the fire is proximal to the ladder fuels and brush, which I believe in my professional opinion was intended to spread a ladder fire."

The fire investigator gave similar testimony. The prosecutor asked, "And, so, based on your observation of this area, did you come to any conclusion about whether or not you believed it was [an] intentionally or maliciously set fire?" The investigator replied, "I did. So something specific about this fire is that it is . . . on a slope, a slight slope. If you were to take a step back and look to where it's burning, it's at the base of the Ortega Mountains, at the bottom of the slope. Just based on its location, to me, that's not a reasonable area to be inhabited for whatever reason . . . something is lit maliciously here for intent of purpose and my professional opinion as to maliciously start a fire."

We agree with the People that this opinion testimony was admissible because "[w]ithout the expert testimony, the jury may not have been able to determine whether the clues found at the scene—the location of the fire, the nearby fuel sources, the types of sticks, the way the sticks were arranged, and the lack of a specific border around the fire—were more indicative of an accidental fire, a fire intentionally set for cooking or warmth, or an intentional fire that was not used for cooking or warmth." It was not the type of opinion evidence " ' "[w]here the jury [was] just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions." ' " (*Summers*, *supra*, 69 Cal.App.4th at p. 1183; see generally, *People v. Cole* (1956) 47 Cal.2d 99, 103—105 [holding admissible an expert opinion by an autopsy surgeon that "a fatal wound could not have been self-inflicted" because "the subject of self-inflicted wounds is not one of such common

21

experience that laymen may not be assisted by the opinion of a doctor, who has special knowledge regarding anatomy and injuries to the human body"].)

But the fire investigator went too far when he opined, based on his "professional opinion," that Gutierrez was the person who started the fire and that he harbored the specific intent required to commit arson when he did it. The prosecutor asked the investigator, "So based on your entire investigation start to finish, any conclusion about whether or not Mr. Gutierrez intentionally and maliciously set that forestland fire?" The investigator replied, "Yes." The prosecutor asked, "What was that conclusion?" The investigator responded, "It was my professional opinion that he maliciously and intentionally started that fire on that property." This was an improper de facto opinion that Gutierrez was guilty. (*Rouston*, *supra*, 99 Cal.App.5th at p. 1011.)

Whether the evidence was sufficient to identify Gutierrez as the person Jorge encountered near the fire was not a question that required the expertise of the fire investigator. The relevant evidence on this point consisted of the in-court identification by Jorge, the in-court identifications by the fire captain and the investigator, and the photos Jorge and the investigator both took at the scene of the fire. There was nothing technical about such evidence that needed to be explained by an expert. And, while the investigator's expertise and opinion about fire causation was admissible and the kind of testimony that is helpful to jurors, it was ultimately the jury's province to decide—in light of that evidence—whether *they* believed Gutierrez in fact harbored the requisite state of mind while setting the fire. The investigator invaded the jury's province when he told them, in essence, that, based on his opinion about how the fire started, he would vote to convict Gutierrez. (See generally, *Rouston*, *supra*, 99 Cal.App.5th at p. 1012

22

[concluding that opinion testimony by a gang expert that the defendant was the person who was holding the gun when the victim was shot was an improper opinion on the defendant's guilt that "usurped the jury's role"].) Had Gutierrez's attorney objected, the testimony would rightly have been excluded.

But Gutierrez's attorney did not object, and so, we address Gutierrez's claim of error through the rubric of an ineffective assistance of counsel claim. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment [of the federal constitution]. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) In particular, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (*Id.* at p. 687.)

Here, the People contend the record is insufficient to determine whether Gutierrez's counsel was ineffective. They proffer several potential explanations for why she may have refrained from objecting for tactical reasons. We find it unnecessary to address these contentions because we

conclude there is no reasonable probability the result of the trial would have been different if the investigator's improper testimony had been excluded. The evidence of Gutierrez's guilt was overwhelming.

Starting with identity, although Gutierrez was not caught red-handed setting the fire, it was awfully close. The fire's remains were located near where Gutierrez emerged from the bushes and returned after asking Jorge for a beer. Jorge saw smoke coming out of the bushes and saw Gutierrez start walking away toward the nearby town, Lakeland Village, after he called 911 for help. The fire captain and the fire investigator saw Gutierrez walking away, too. When Jorge and the captain entered the bushes, where they had just seen the smoke, embers were still smoldering in a pile of ashes and a fire appeared to have just been put out. When Gutierrez was later arrested in Lakeland Village, he had multiple lighters with him, including a high-powered butane lighter that was out of fuel. Jorge also took a photograph of Gutierrez while he was near the fire site and was able to identify him at trial.

Circumstantial evidence that the fire was set intentionally and maliciously was also strong and compelling. At the site of the fire, the burned area was in the middle of "heavy vegetation." It was on a slope that was not conducive to camping or hanging out. The location of the fire was "potentially a hazardous area" where the fire could have spread easily. And there were "surface fuels" on the ground that would have allowed the fire to spread to nearby "ladder fuels" which would then have allowed it to spread to "aerial fuels" at the tops of nearby trees. Yet there was no evidence of an attempt to contain the fire, with a circle of rocks, for example. There were no utensils, "cooking materials, pans, food, [or] discarded trash" nearby. There was also no evidence the fire was caused accidentally by fireworks, a

24

discarded cigarette butt, or other source of combustion. Burned materials that appeared to have been used for fuel were gathered in a pile. Materials located near where the fire had been set were "not indigenous to that specific area." And those materials included branches that had been recently broken and that were "compiled in [an] arrangement" that would be "conducive to facilitate combustion."

This evidence easily satisfies all the elements of arson of forest land. (Pen. Code, § 451, subd. (c).) On this record, we do not believe there is a reasonable probability the jury would have reached a different result had counsel objected to the fire investigator's improper testimony. We affirm Gutierrez's conviction.

## III.

### *Fines and Fees*

At sentencing, the trial court ordered Gutierrez to pay a restitution fine of $5,700 (Pen. Code, § 1202.4, subd. (b)) and imposed and stayed a parole revocation fine of $5,700 (Pen. Code, § 1202.45, subd. (c)). The court also imposed a criminal conviction assessment of $60 (Gov. Code, § 70373), and a court operations assessment of $80 (Pen. Code, § 1465.8).

Gutierrez's counsel asked the trial court to consider Gutierrez's ability to pay these fines and ancillary costs pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157, and argued he could not afford them. After listening to argument, the trial court stated, "I'm not going to make any findings under *Dueñas*."

Gutierrez interprets the trial court's statement to mean it declined to consider Gutierrez's ability to pay the fines and fees when imposing them. He seeks remand with directions to hold an ability-to-pay hearing. The People, by contrast, interpret the court's statement to mean it considered

Gutierrez's ability to pay and concluded he could pay the fines and fees that were imposed.

At the time of the sentencing hearing, there was "a divergence among the Courts of Appeal regarding court-ordered financial obligations imposed on criminal defendants." (*Kopp, supra,* 19 Cal.5th at p. 9.) Our high court recently resolved much of this divergence, and in doing so, disapproved of *Dueñas*'s holding that there is a "due process requirement to hold an ability to pay hearing before imposing every punitive fine." (*Kopp,* at p. 23.) The court held that, in addition to the statutory obligation to consider a defendant's inability to pay when imposing a restitution fine above the minimum amount, an "excessive fines analysis, which considers ability to pay, is [also a] proper vehicle to challenge punitive fines." (*Ibid.*) As for ancillary costs, the court held "equal protection principles require a court, upon request, to consider a defendant's inability to pay before imposing a court operations assessment under Penal Code section 1465.8, subdivision (a)(1) or a court facilities assessment under Government Code section 70373, subdivision (a)(1)." (*Id.* at p. 30.)

Because the law was in a state of flux when Gutierrez was sentenced, and because the trial court did not detail its reasons for declining to "make any findings under *Dueñas*," we are unable to ascertain whether Gutierrez's ability to pay was considered using the correct legal standards. On remand, if Gutierrez renews his request, we therefore direct the trial court to conduct an ability to pay hearing under the guidance of our high court's recent decision.

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court. The court is directed to strike the jury's true finding on the Penal Code

26

section 454 enhancement allegation and conduct a full resentencing hearing. If requested by Gutierrez, the court is further directed to conduct a hearing, pursuant to the framework set forth in *Kopp*, *supra*, 19 Cal.5th 1, to address Gutierrez's ability to pay fines and ancillary costs.


DO, J.

WE CONCUR:


McCONNELL, P. J.


RUBIN, J.